UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                              Chapter 11

652 WEST 160TH LLC,                                 Case No. 04-18038 (ALG)

                            Debtor.

-------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

ROBINSON BROG LEINWAND GREENE
  GENOVESE & GLUCK P.C.
Counsel for the Debtors
  By:  A. Mitchell Greene, Esq.
       Scott A. Steinberg, Esq.
1345 Avenue of the Americas
New York, New York 10105

MICHAEL A. CARDOZO, ESQ.
Corporation Counsel, City of New York
Counsel for the Tenants Committee
  By:  Hugh Shull, Esq.
       Philip M. Caal, Esq.
100 Church Street, Room 5-197
New York, New York 10007

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Counsel for the Tenants Committee
  By:  Thomas J. Maloney, Esq.
       Kurt A. Mayr, Esq.
       Timothy S. Mehok, Esq.
       Kelly R. Koyama, Esq.
One Liberty Plaza
New York, New York 10006

              -and-

KENNETH ROSENFELD, ESQ.
NORTHERN MANHATTAN IMPROVEMENT
CORP. LEGAL SERVICES
Counsel for the Tenants Committee
   By:   Kenneth Rosenfeld, Esq.
          Matthew J. Chachere, Esq.
76 Wadsworth Avenue
New York, New York 10033

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

        Before the Court is a motion by the City of New York (the "City") seeking to lift

the automatic stay so as to effectuate a foreclosure against 652 West 160th Street (the

"Debtor").  A committee of lessees of the Debtor (the "Tenants Committee") has moved

to dismiss the case or, in the alternative, joins in the City's request to lift the automatic

stay.  The question raised is whether the Court should exercise its discretion to relieve the

Debtor from the consequences of its continued defaults where the Debtor filed in bad

faith and then proceeded to flout known deadlines, to make unauthorized post-petition

payments and to file false documents with the Court, and where no creditors exist who

need the protection of this proceeding.  The Debtor's principal response is that more than

enough money is available to fund a plan of reorganization that pays all "creditors" in

full.  The very fact that this Debtor has at all times had more than enough funding

available, however, confirms a finding of bad faith.

        Based on extensive motion papers and a full evidentiary hearing, the Court makes

the following findings of fact and conclusions of law.

**Background**

**Baruch Singer's Business**

Baruch Singer ("Singer") is the sole member of more than 100 limited liability companies, each formed for the purpose of managing one of Singer's real properties. Singer describes himself as an "expert" in purchasing distressed properties. During his testimony, Singer explained that he would seek out properties that had large tax or utility debt and that also usually needed substantial repairs. After negotiating with the City to reduce the debt, Singer would restore the property and "upgrade" the building, starting at the top floor and working his way down. Singer explained that he could only turn a profit on a building after the upgrade was completed, since many of the rents in his buildings were subject to rent regulation and were below market. Singer claimed he would wait for "vacancies" and then raise the rent to "market value."

Singer typically financed new acquisitions through Park National Bank ("Park National"). He testified that Park National would lend funds to him personally, that he would purchase a building, and that he would transfer the deed to the newly-acquired building to a limited liability company created for the sole purpose of holding that real estate. Singer claimed that Park National would agree to transfer the debt incurred in connection with the purchase of a building to the property and take out a mortgage on the building only if he met certain conditions: one tranche of lending would be available after Singer cured any outstanding utility bills, another would be available after Singer cured outstanding tax bills, and more funding would be available after Singer made repairs necessary to bring the building into compliance with City requirements. Singer also

admitted, however, that he could turn to Park National for funding virtually at will, and as
discussed below, the record bears this out.

Singer claimed that each of his limited liabilities companies is treated as a
separate entity for which he keeps separate books and records.  The record shows that
there is a separate checkbook for this Debtor, and presumably for Singer's many other
properties.  On the other hand, Singer admitted that he is the sole member of each "LLC"
and that he does not hold formal member's meetings or keep minutes pertaining to the
decisions he makes for the companies.  He also testified that notwithstanding the separate
checkbooks, rent generated by all his buildings is deposited into the same "basket
account" and subsequently allocated by an accountant to the proper company.  Singer
withdraws funds for his personal expenses from this same master account.  The record is
also clear that Singer's purchases for a property are not made by the property individually
but by a Singer employee on the credit of the entire group.

**652 W. 160th Street**

In 2003, Singer purchased the Debtor, consisting of 58 apartments located on
West 160th Street, a neighborhood that, in Singer's view, showed signs of gentrification
(the "Premises").  As was the ordinary practice, Park National lent the money ($675,000)
to Singer for the purchase of the Premises.  At the time of the purchase, the Premises
were burdened by over $300,000 in unpaid water and sewer bills and over $2,900,000 in
unpaid taxes.  New York City had also cited the Premises for multiple Building Code
violations, including many deemed serious, such as electrical deficiencies, faulty heating

and structural problems along the "two-line."[1]   The owner had a legal duty to cure these deficiencies.

Shortly after purchasing the Premises, Singer contacted Samuel Singer (no relation), an "expediter" who had previously worked with Singer on City tax and utility charges, to contact the relevant City agencies and attempt to reduce the outstanding water and sewer bills.  Samuel Singer testified that he contacted the proper City agencies and was able to negotiate a significant reduction in the water and sewage charges.  Baruch Singer subsequently paid the reduced bills.

Samuel Singer also warned Baruch Singer about the City's outstanding tax bills and offered to try to work on them as well.[2]   As noted above, Baruch Singer had purchased the Premises subject to outstanding property taxes of more than $2,900,000. Samuel Singer was not hired to deal with the outstanding tax bills, however, and the record shows Singer made no attempt to cure or to negotiate the tax bill prior to the foreclosure judgment or the filing of the bankruptcy case.  On August 27, 2004, the New York Supreme Court entered judgment against the Premises in an *in rem* property foreclosure action based on the outstanding taxes and the City's lien therefor.  The entry of this judgment then commenced a four-month "redemption period" during which Singer could avoid losing the building if he paid in full all unpaid taxes and charges with interest or negotiated a longer-term arrangement.  The record shows no effort by Singer to deal with the taxes during this period.

---

[1] The "two-line" is the line of apartments whose numbers end in two.
[2] Samuel Singer testified that it was common to settle outstanding City tax bills for less than face amount.

**The Bankruptcy**

On December 23, 2004, one day before the expiration of the four-month statutory redemption period subsequent to the City's foreclosure proceedings, the Debtor filed a petition under Chapter 11. Singer continued, however, to ignore the outstanding tax bills, with one exception. Singer was apparently aware of some requirement on a debtor to commence payments of interest to secured creditors no later than 90 days after a filing.[3] In February 2005, after the bankruptcy filing, he personally visited a cashier at the City Department of Taxation's office carrying two checks alleged to have aggregated more than $50,000. He says he intended to pay the post-petition taxes and pre-petition interest. Singer testified that his payment was refused by the cashier on the ground the taxes were "in litigation." Singer made no other attempt to cure any tax defaults until he filed a plan in the Chapter 11 case.

Singer did attempt to make repairs required by the City. Singer facilitated repairs to the electrical and heating systems, the windows in the common area, and the fence in the back yard. Jan Friedman, a city engineer assigned to the Premises, testified that all the repairs that Singer actually completed were performed to his satisfaction. Singer was unable to complete the structural repairs to the two-line because certain tenants were uncooperative. However, Singer was able to gain access to some of the apartments and work commenced in April 2005. Singer testified that he wanted to complete the work he started, and the general contractor testified that at the time of trial, one apartment was finished, with two more substantially completed.

---

[3] This is a requirement for a "single asset real estate debtor." In connection with these motions, Singer initially took the position that 652-656 West 160th Street constituted two separate properties. He later conceded that the Debtor is a single asset real estate company within the meaning of § 101(51B) of the Bankruptcy Code.

Except for Singer's purported proffer of one tax payment and his funding of repairs, the Debtor otherwise ignored its post-petition responsibilities as a debtor in possession, subverted the results of its own bar date order, the one order it did obtain, and repeatedly made improper post-petition payments and filed false operating reports.

As noted above, there is no dispute at this point in the case that the Debtor is a single asset real estate entity, subject to § 362(d)(3) of the Code. The Debtor is thereby required to file a reasonably confirmable plan within 90 days of the filing to keep the automatic stay in place. 11 U.S.C. § 362(d)(3). The Debtor filed its plan of reorganization and noticed a hearing to approve a disclosure statement more than 90 days after the petition date and only after the City and the Tenants Committee had moved to lift the stay.

The only substantive relief the Debtor obtained in the first two months of the case was an order setting April 8, 2005 as the bar date for claims. But the Debtor thereupon proceeded to subvert its own order. According to the Debtor's schedules,[4] it had one unsecured priority creditor, New York City Department of Taxation, and four small unsecured non-priority creditors. Each of these debts, however, was listed as disputed or contingent. Of the creditors listed on the schedules, only the City Department of Taxation and Finance filed a timely proof of claim and therefore the estate was left with only one legitimate pre-petition creditor, the City. This was apparently unacceptable to the Debtor. On May 13, 2005 (the "May Amendment"), over one month after the expiration of the bar date, the Debtor filed amended schedules changing all the prior trade

---

[4] At trial, the Debtor's attorneys represented that the schedules originally filed with the Debtor's petition were "garbled" during transfer to the Court's electronic docket, which necessitated the filing of "amended" schedules within the first month of the case. The Court credits the representations of counsel and will treat the first amended schedules as though filed with the petition.

7

debt from disputed to undisputed.  The May Amendment, if valid, would excuse these entities from their defaults in failing to file timely proofs of claim.  At trial, Singer claimed that this "amendment" corrected a mistake, and that none of the debt was ever disputed.  The fact remains that the Debtor, without leave of the Court, subverted the order it had obtained and created all of the alleged unsecured debt in this case, without leave of the Court, after it had been barred by operation of law.  (Notwithstanding the amendment to the Debtor's schedules and Singer's statements, two of the four trade creditors filed late proofs of claim, on June 21, 2005.)[5]

The amendments to the Debtor's schedules also created another purported creditor.  In the schedules filed with the petition, Park National was not listed as a creditor.  In the May Amendment, Park National was included on the schedules with an alleged undisputed claim of $675,000.  As will be further discussed below, Park National is not a creditor of this Debtor but of Singer personally.

The Debtor also consistently paid interest to Park National on Singer's debt during the course of the case and failed to disclose these payments.  There was no dispute at trial that the Debtor paid Park National interest payments of over $6,000 per month throughout the bankruptcy, and that these payments were *at best* unauthorized payments of interest to an unsecured pre-petition creditor.  Both Singer and his accountant, David Bahr, testified that these payments were the result of a "computer error," where the computer that drafted the checks had an improper setting and was erroneously issuing checks from the Debtor's pre-petition bank account.  This excuse, however, does little to

---

[5] The Court will discuss below whether any of the listed entities are in fact legitimate creditors of this estate.

04-18038-alg    Doc 82    Filed 09/28/05    Entered 09/28/05 09:10:56    Main Document
Pg 9 of 26

account for the fact that all of the checks to Park National were hand-signed by Singer and at least one of them was handwritten, also by Singer.

Moreover, the Debtor's operating reports failed to disclose these payments. As required, the Debtor filed monthly operating reports, and Singer signed each report verifying its accuracy. Only one of the operating reports as originally filed disclosed a payment to Park National. After the multiple payments were disclosed on the record, the Debtor amended its filed operating reports to reflect the payments to Park National. The record at trial, however, shows that on June 2, 2005, the Debtor made its customary and improper monthly interest payment to Park National. Once again it failed to disclose this in its June operating report, which was filed on the same date as its amended operating reports. As of this date, no amended operating report has been filed for June. The Debtor has also apparently failed to demand that Park National return any of the unauthorized payments, and the record does not show that any payments have been returned.

### Discussion

The Debtor argues that the Court should exercise its equitable powers to relieve it from its defaults because it has filed and is prepared to consummate a plan of reorganization that pays all "creditors" in full and accomplishes a "reorganization" of the Debtor. The City and the Tenants Committee argue that the Court should lift the automatic stay to allow completion of the City's foreclosure on the Premises and that the case should be dismissed as a bad faith filing. Under the particular facts of this case, the Debtor's ability to fund a plan makes the prior history all the more inexcusable, and the relief sought by the City and the Tenants Committee should be granted in large part.

This case has been marked by a debtor's filing on the eve of termination of the foreclosure redemption period and its subsequent actions that include failure to comply with statutory deadlines, the making of unauthorized payments, the filing of false reports, and the creation of spurious debt. The Debtor has failed to provide a reasonable excuse for any of its actions, and it certainly has not shown grounds for being relieved from the consequences of its defaults. The cumulative effect of the Debtor's conduct justifies the relief sought by the City and the Tenants Committee, relief from the automatic stay and likely dismissal of this case at a subsequent point in time. There is one caveat: the Debtor has paid for repairs on the Premises, at the City's insistence, and it deserves to be reimbursed for the expenses it has incurred that benefit the secured creditor by obtaining a lien therefor under § 506(c) of the Bankruptcy Code.

**Failure to Comply With the Deadlines for Single Asset Real Estate Debtors**

The Debtor's first default was its failure to comply with the requirements for preserving the automatic stay in a single asset real estate case as set forth in § 362(d)(3) of the Bankruptcy Code. The Bankruptcy Reform Act of 1994 added that provision to put additional responsibility on a single asset real estate debtor and prevent a perceived abuse of the bankruptcy process on the part of these ventures. See S. Rep. No. 168, 103d Cong., 1st Sess. (1993). Although this Debtor initially argued in its papers that it was not a single asset real estate venture within the meaning of § 101(51B) of the Bankruptcy Code,[6] at trial the Debtor conceded the point, and there is no question that § 362(d)(3) applies. Section 362(d)(3) of the Bankruptcy Code provides in pertinent part:

---

[6] Section 101(51B) of the Bankruptcy Code defines single asset real estate as "a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the real property . . . ."

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . .

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period)—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate.

In the case at bar, the Debtor failed to satisfy the requirements of § 362(d)(3)(A). The Debtor filed this case on December 23, 2003, and a plan of reorganization was due in mid-March, 2005. The Debtor was not granted any extension of time to file a plan. The Debtor first filed its proposed plan of reorganization on May 3, 2005, well past the deadline.

The Debtor makes a series of arguments to cover its default. First, it argues that § 362(d)(3)(B) is applicable and benefits only consensual secured creditors. The words of the statute are to the contrary. The subsection excepts from the requirement of commencement of interest payments secured creditors whose debt is secured by a judgment lien or an unmatured statutory lien. See *In re Syed*, 238 B.R. 133, 139 (Bankr. N.D. Ill 1999).[7] But the Debtor's own position is that the City does not have a judgment lien because its foreclosure is not complete; whether it actually has a judgment lien as

---

[7] The Debtor attempts to distinguish *Syed* on the ground that the Court did not grant relief from the stay exclusively for the Debtor's failure to comply with § 362(d)(3) but for a series of other defaults. That makes *Syed* all the more applicable, as this Court finds that the City should have relief from the stay "for cause" based on the entire record.

well, it appears from the record that the City does have a matured statutory lien.  Cf. *In re Houts*, 23 B.R. 705, 707 (Bankr. W.D. Mo. 1982).

In addition, Singer testified that he has been involved in at least three other single asset real estate bankruptcies and that he thought it would be "prudent" for him to comply with the requirements for a single asset real estate case.  The Debtor in fact argues that Singer's visit to a cashier's counter bearing checks constitutes a proffer of monthly payments to a secured creditor.  The correct characterization of this action is that it was a charade performed for the purpose of creating a record.  Singer admitted that neither he nor his counsel communicated with the City to determine an appropriate payment plan under § 362(d)(3)(B); that he knew he would not be able to negotiate a payment amount with the cashier; that he took an associate with him to bear witness;  and that neither he nor his counsel did anything further once the anonymous cashier stated he could not accept a check because the building was in litigation.  Moreover, assuming *arguendo* that a timely payment was proffered, one interest payment made two months into the bankruptcy does not meet the statutory requirement of "monthly payments."

Moreover, if any ambiguity existed as to the requirements of § 362(d)(3)(B), the statute provides an alternative safe harbor; the filing of a plan of reorganization that has "a reasonable possibility of being confirmed within a reasonable time."  11 U.S.C. § 362(d)(3)(A).  While that alternative was unsuccessfully advanced by the debtor in *Syed*, 238 B.R. at 140, Singer did not even avail himself of this alternative in a timely manner.

Singer argues further that the cases permit a court to take action other than to terminate the stay, even if § 362(d)(3) is violated, and that a court has the power to reimpose the automatic stay even where it has terminated.  There is no need to reach this

issue.[8]  For the reasons discussed below, assuming the Court had power to grant this

Debtor relief, there would be no basis for such action on the record of this case.

**The Debtor Failed to Redeem the Property During the Statutory Period, Extended
by Virtue of the Bankruptcy Code**

The Tenants Committee and the City asserted in their initial motion for relief

from the automatic stay that the statutory period for redemption had expired and that

there was no ability to revive it.  The Debtor argued that the City had not completed the

foreclosure at the time the bankruptcy was filed and that the City is therefore merely a

secured creditor stayed from taking the final steps in an incomplete foreclosure.

Although the Tenants Committee and City, in their joint post-trial brief, do not pursue the

running of the redemption period as a separate reason for dismissing the case or

terminating the stay, the Court finds the Debtor's default in taking action to redeem the

property, or to obtain an extension of time, another relevant factor for its finding of

"cause" to lift the stay.

It is a standard principle that absent express Federal law to the contrary, a debtor's

property rights are defined by State law and are not altered by a bankruptcy filing.  See

*Butner v. United States*, 440 U.S. 48, 55 (1979).  With respect to the right to redeem, the

relevant questions are what rights this Debtor had under State law, as of the filing of the

Chapter 11 case, and what protections the Bankruptcy Code provided with respect to the

City's foreclosure proceedings.

After the filing of an *in rem* foreclosure judgment, the New York City

Administrative Code ("N.Y.C. Admin. Code") grants the owner of real property the right

---

[8] Collier suggests to the contrary, that "the legislative intention was to terminate the stay when the debtor
neither proposes a viable plan nor makes payments to the secured party."  3 Collier on <u>Bankruptcy</u> ¶
362.07[5] (15th ed. 2005), citing *NationsBank, N.A. v. LDN Corp*. (*In re LDN Corp*.), 191 B.R. 320, 326-
27 (Bankr. E.D. Va. 1996).

to redeem by paying "all taxes, assessments and other legal charges owing on said parcel, the lawful interest thereon to the date of payment and a penalty of five percent of said payment . . . ." N.Y.C. Admin. Code § 11-412.1(d). The redemption period lasts for four months, at which point the property owner loses the right to redeem the property. But in order for the foreclosure to be complete, the commissioner of finance must execute a deed conveying title to the City or to a third party, within a second four-month period. See N.Y.C. Admin. Code § 11-412.1(c). During this second four-month period, even after the lapse of the redemption period, and until the deed is executed, an owner of real property is left with all "rights, liabilities, responsibilities, duties and obligations of an owner of such parcel . . . unless and until the commissioner of finance has prepared and executed a deed conveying to the city or to a third party full and complete title to such parcel." N.Y. Code § 11-412.1(c).

The Debtor argues that the City cannot have it both ways, leaving an owner with all "rights, liabilities, responsibilities, duties and obligations of an owner" while at the same time divesting the owner of its redemption right, and that § 11-412.1(c) operates as a "savings clause" preserving in full the Debtor's interest in the Premises. Thus, the Debtor argues, it continued to have the right to redeem until a new deed was prepared or until the City obtained relief from the stay in order to convey a deed to itself or to a third party.

The New York courts have taken a strict view of an owner's right to redeem, limiting the right to the four-month period subsequent to the foreclosure judgment. See *City of New York v. Melamed (In Rem Tax Foreclosure Action No. 47)*, 19 A.D.3d 547, 548, 798 N.Y.S.2d 82 (N.Y. App. Div. 2d Dept. 2005) (holding that the Supreme Court

14

had abused its discretion in staying enforcement of a foreclosure judgment because the "sole remedy" of an owner who failed to interpose an answer "was to make a late redemption payment"); see also *ISCA Enterprises v. City of New York*, 77 N.Y.2d 688, 695, 572 N.E. 2d 610, 569 N.Y.S.2d 927 (1991). This Court has also held that under New York law, a property owner whose building has been through the *in rem* foreclosure process retains the equitable right of redemption only up to the expiration of the four-month redemption period. See *In re Sadie Haynes*, 283 B.R. 147, 155 (Bankr. S.D.N.Y. 2002).

Moreover, it is the general rule that while the automatic stay may freeze a creditor's attempts to reach a debtor's property, it generally does not toll statutory periods whose expiration may adversely affect the debtor's property interests. Rather § 108(b) is the operative provision of the Bankruptcy Code that extends the period for only 60 days.[9] See *Canney v. Merchant's Bank (In re Frazer)*, 284 F.3d 362, 372-73 (2d Cir. 2002), which held that § 108(b), and not § 362, tolled a redemption period created under the Vermont strict foreclosure statute, but only for 60 days after the filing of the petition.

Vermont apparently is one of a very few States that follows the strict foreclosure and the principle that title resides in the mortgages. But the Circuit Court's reasoning in

---

[9] Section 108(b) provides in pertinent part:

> [I]f applicable nonbankruptcy law . . . fixes a period within which the debtor . . . may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure or perform, as the case may be, before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) 60 days after the order for relief.

11 U.S.C. § 108(b).

*Canney* did not rest on the legal fiction that title was in the secured party.  Moreover, the

Circuit Court cited as persuasive several Circuit cases and one District Court case where

State foreclosure principles were closer to New York's.  See *Johnson v. First National*

*Bank*, 719 F.2d 270, 278 (8th Cir. 1983) (Minnesota law); *Bank of Commonwealth v.*

*Bevan*, 13 B.R. 989, 990 (E.D. Mich. 1981) (Michigan law).  Thus, under *Canney*, where

a State court has issued an *in rem* foreclosure judgment that triggers a period of equitable

redemption, and the Debtor files a bankruptcy petition before the end of the period, the

redemption period is extended for 60 days by § 108(b).  However, once that period has

expired, the debtor cannot ordinarily redeem the property absent some independent

federal right to redemption.  See *Canney*, 284 F.3d at 373; see also *In re Spencer*, 263

B.R. 227, 231 (Bankr. N.D. Ill. 2001); *Provident Bank v. Lewitt*, 852 A.2d 852, 855-56

(Conn. App. Ct. 2004).

   In the case at bar, the City obtained an *in rem* foreclosure judgment, which

commenced the period for equitable redemption.  It is not contested that the Debtor took

no steps to redeem during that period.  Subsequently, on the eve of the expiration of the

redemption period, the Debtor filed for bankruptcy.  The bankruptcy filing extended the

period to redeem for an additional 60 days, but during that period, the Debtor again made

no attempt to redeem.  As stated above, the New York Code requires payment in full of

all taxes, plus interest and attorney's fees.  Singer's uncontested testimony is that, *at best*,

he went to the City cashier with the intent of paying only the post-petition taxes and the

pre-petition interest.  This act by itself was insufficient to constitute a good faith effort to

comply with the redemption period under State law, extended by a debtor's additional 60

days.

Moreover, the Debtor has not suggested any equitable grounds that would justify a further extension of the Debtor's time to redeem. As noted above, the Circuit Court in *Canney* cited with approval the early case of *Bank of Commonwealth v. Bevan*, in which the Court held not only that the extension of a redemption period was governed by § 108(b), but also that a bankruptcy court had power to extend the 60-day period, based on the equities of the case. *Bank of Commonwealth*, 13 B.R. at 996. It is therefore assumed that this Court would have the power, in an appropriate case, to extend the redemption period, a conclusion that is supported by the provisions of the N.Y.C. Administrative Code that give a mortgagor, prior to the date on which the City executes a deed, all the "rights" of an owner. This Debtor has not suggested any reason, however, why the Court should exercise the power to extend the period. Singer, a real estate operator experienced in the operation of distressed properties and in bankruptcy proceedings, purchased the Debtor months before the City's foreclosure judgment became final. He dealt with the water and sewer charges on the Premises and hired an expediter who was able to negotiate a significant reduction in these charges. Yet despite advice from the expediter and his experience in connection with defaulted taxes, he did nothing about the much larger tax bill. After the Chapter 11 filing and during a redemption period that was extended by virtue of § 108(b), Singer again did not act. Not only did he fail to engage the City or even attempt to deal with the taxes, he did not seek from the Court an extension of the redemption period for these purposes. For its part, the City promptly moved for relief from the stay.

While Singer argues that he did not have enough money available to pay the taxes during the redemption period, and that Park National requires that a property be repaired

and tax liabilities be resolved before it will lend money based on the property, he testified – indeed, boasted – about his ability to borrow funds from Park National and also from New York Community Bank at any time he wanted. Moreover, Singer has proffered as the main support for his "good faith" in this case a plan of reorganization that provides for Park National financing that would pay the City's tax bill in full. This financing is dependent only on Singer's personal guarantee, presumably backed by his many other properties. Singer has not provided any reason why the funding that has now become available would not have been available to him earlier.[10]

As noted above, it may be that in an appropriate case, a court can extend the redemption period in order to permit a debtor to retain its interest in real property. But the Debtor has not shown any equitable ground for granting it the extraordinary relief of a retroactive extension of the expired redemption period. On the contrary, as further discussed below, the Debtor's actions in connection with the filing and throughout the Chapter 11 case provide an independent reason for refusing to relieve the Debtor from the consequences of its defaults and granting relief from the stay.

**The Debtor's Bad Faith Is an Additional Reason for Granting the City Relief from the Stay**

Many courts have granted relief from the stay after finding that the case was not filed in good faith. See *Laguna Assocs. Ltd. Partnership v. Aetna Casualty & Surety Co.* (*In re Laguna Assocs. Ltd. Partnership*), 30 F.3d 734 (6th Cir. 1994); *Barclays-American/Business Credit, Inc. v. Radio WBHP, Inc.* (*In re Dixie Broadcasting, Inc.*), 871 F.2d 1023 (11th Cir. 1989); *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205

---

[10] It appears that Singer has another bankruptcy case before this Court that he filed in circumstances similar to those at bar. In that other case, Singer has also filed a plan that pays all creditors in full with proceeds borrowed from Park National based on his personal credit. *In re 9 West 107 St.*, 04-18037(ALG), filed on the same day as this case; see also Amended Plan of Reorganization filed on June 24, 2005.

18

B.R. 196 (B.A.P. 9th Cir. 1996); 3 Collier on Bankruptcy ¶ 362.07[6] (15th ed. 2005).
The Second Circuit endorsed the principle that a Chapter 11 case could be dismissed as a
bad faith filing in *C-TC 9th Ave. Partnership v. Norton Co. (In re C-TC 9th Ave.
Partnership)*, 113 F.3d 1304 (2d Cir. 1997), a single asset real estate case where the
debtor filed a Chapter 11 petition in response to a foreclosure commenced by a secured
creditor.  The Circuit Court held that the Bankruptcy Court did not abuse its discretion in
dismissing the case where "on the filing date there was no reasonable likelihood that the
debtor intended to reorganize and no reasonable probability that it would eventually
emerge from bankruptcy proceedings."  *C-TC 9th Ave. Pshp.*, 113 F.3d at 1309, quoting
*Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222,
227 (2d Cir. 1991).

   The Court in *C-TC 9th Ave. Partnership* set forth the factors that tended to
establish that the debtor in that case did not have a valid reorganizational purpose.[11]  The
City and Tenants Committee rely on *C-TC 9th Ave. Partnership* and note, correctly, that
many of these factors are present in this case, which is a single asset case in which the
debtor has few (actually, no) unsecured creditors, where the petition was filed to delay

---

[11] The Circuit Court set forth the following factors that may indicate a bad faith filing:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the
> secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default
> on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and
> secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of
> the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor cannot meet current expenses including the payment of personal property and real
> estate taxes; and
> (8) the debtor has no employees.

*C-TC 9th Ave. Pshp.*, 113 F.3d at 1311.

foreclosure, and where the debtor's operating reports reveal it cannot meet current expenses on its own. On the other hand, it is difficult to find on this record that on the day of the filing no "reasonable probability" (within the *C-TC* formulation) existed that the Debtor would emerge from bankruptcy. As discussed below, this Debtor has always had the ability to fund a plan of reorganization. Moreover, the courts have properly held that they should dismiss on grounds of a "bad faith filing" sparingly, "with great caution… " *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989); see also *In re Johns-Manville Corp.*, 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984); *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997); *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001); see also *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d at 227 (holding that a single asset real estate case had not been brought in bad faith, even though filed to prevent foreclosure).

Nevertheless, in this case, a series of factors leads to the inescapable conclusion, reached "with great caution," that this Debtor has filed and prosecuted this case in bad faith. The factors provide additional reasons for refusing to relieve the Debtor from the consequences of its defaults and for finding "cause" for relief from the stay.

First, the Debtor's "reorganizational purpose" on the day of the filing is highly suspect. Singer purchased the Premises with knowledge of the tax bill and the foreclosure proceedings. This highly sophisticated Debtor then failed to deal with the City's tax bill during the months prior to the entry of the foreclosure judgment, and it failed to deal with the taxes thereafter. The Debtor cannot credibly claim that it needed more time to negotiate with the City over the tax bill because it never made any effort to engage the City. Nor can the Debtor credibly claim that it needed the "protection" of a

bankruptcy filing as a means of obtaining a reduction in the City's tax bill.  A debtor

cannot use a bankruptcy filing solely as a tactic designed to gain a litigation advantage

over a creditor.  See *Fraternal Composite Servs. v. Karczewski*, 315 B.R. 253, 256

(N.D.N.Y. 2005); *In re Schur Mgmt. Co.*, 323 B.R. 123, 130 (Bankr. S.D.N.Y. 2005).

Further, a bankruptcy filing is not in good faith if the debtor seeks in effect to obtain time

during which to speculate that the market value will increase and make its investment

worthwhile.  See *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 759 (Bankr. S.D.N.Y.

1997).[12]

      After the petition was filed, the Debtor then proceeded to administer its case in a

manner in which statutory deadlines were missed, false creditors were created and paid

and false reports were filed.  Section 1112(b) of the Bankruptcy Codes provides for

dismissal "for cause," including (in a non-exclusive list) "unreasonable delay by the

debtor that is prejudicial to creditors."  As one text states, § 1112(b) of the Bankruptcy

Code "applies at various stages in the case to test whether the benefits of reorganization

are likely to be achieved within a reasonable amount of time and in a manner that is

consistent with the requirements and restrictions of the Code."  3 Collier on <u>Bankruptcy</u> ¶

1112.07[1] (15th ed. 2005).   Many courts have found that a debtor's misconduct in the

administration of the bankruptcy case constitutes a lack of good faith and cause to

dismiss.  See *In re Continental Holdings, Inc.*, 170 B.R. 919, 929-30 (Bankr. N.D. Ohio

1994); *Babakitis v. Robmo (In re Robino)*, 243 B.R. 472, 486 (Bankr. N.D. Ala. 1999); *In*

---

[12] As the Court stressed there, "It is important to draw a distinction here.  On the one hand, there is nothing inimical to the purposes of the Bankruptcy Code in the shrewd identification of the net present value and hidden potential for successful rehabilitation of a struggling business.  On the other hand, a debtor shows bad faith when it uses bankruptcy protection for risk-free speculation in the single asset.  A court must vigilantly protect the integrity of the judicial process and the interests of secured creditors to ensure that reorganization is being sought and that the debtor is not simply gambling with the creditor's money."  214 B.R. at 759-60.

*re Rognstad*, 121 B.R. 45, 50-51 (Bankr. D. Haw. 1990); *In re Syndicom Corp.*, 268 B.R.

26 (Bankr. S.D.N.Y. 2001); see also *In re Adbrite Corp.*, 290 B.R. 209, 221 (Bankr.

S.D.N.Y. 2003).  In the present case a series of factors compel a finding that the case has

not been prosecuted in good faith.

Thus, even if the Debtor could credibly claim that it needed to file in order to

obtain a stay of the foreclosure, it proceeded to ignore its obligations as a single asset real

estate debtor to comply with § 362(b)(3) of the Bankruptcy Code, and its obligations to

redeem within the additional 60 days provided by virtue of § 108(c) of the Bankruptcy

Code.  Singer's charade of taking blank checks to a cashier indicates bad faith, not good

faith, because it makes plain Singer's knowledge of an obligation that he was pretending

to fulfill.

The Debtor argues that its filing of a plan that pays all "creditors" in full excuses

all of its prior defaults, but the Debtor's proposed plan in fact confirms that Singer has at

all times had the ability to fund a plan and that his failure to do so on a timely basis is

unexplained.  The cases have also held that the Debtor's bad faith is not cured by its

subsequent filing of a reorganization plan.  As the Court stated in *In re Natural Land

Corp.*, 825 F.2d 296, 297-98 (11th Cir. 1987), § 1129(a)(3) of the Bankruptcy Code

requires that a plan be filed in "good faith," and the "taint of a petition filed in bad faith

must naturally extend to any subsequent reorganization proposal; thus, any proposal

submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's

good faith requirement."  See also *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395

(11th Cir. 1988) ("The possibility of a successful reorganization cannot transform a bad

faith filing into one undertaken in good faith.").

The foregoing is not to say that a court can lightly ignore a plan that pays all creditors in full.   The Debtor argues that the stay should remain in effect and the case should be sustained for the benefit of the Debtor's "other creditors."  This contention would have more significance if there were any real creditors in the case, other than the City.

As discussed above, the Debtor did obtain one order early in the case, a bar order setting a deadline for the filing of claims.  Only the City filed a claim, leaving it as the sole creditor in the case.  The Debtor had previously filed schedules that listed four trade creditors, but each of these creditors had been listed as holding debt that was contingent, unliquidated or disputed, and the failure of these creditors to file timely proofs of claim barred them from participating in the case, as provided in the bar order.  See Bankruptcy Rule 3003(c)(2).  Without obtaining a Court order or other relief, the Debtor thereupon purported to file amended schedules, which if valid would afford each of these entities, as well as Park National (which had never been listed as a creditor at all), an undisputed claim.  The Debtor thereby not only subverted its own bar order but purported to list as creditors entities that, for the most part, have no claims against this estate.

The principal entity that the Debtor purported to benefit was Park National, with an alleged undisputed claim of over $675,000.  This claim represents the funds that Park National provided to Singer to acquire the Debtor.  Singer testified, however, that Park National loaned the money to him personally, and the Debtor produced no documentation whatsoever to indicate that it had assumed Singer's acquisition debt.  In addition, it would have been entirely inappropriate for a debtor with $2.9 million in unpaid taxes to incur this debt in connection with its own acquisition.  Cf. *United States v. Tabor Court*

*Realty (In re Gleneagles Invest. Co.)*, 803 F.2d 1288, 1296-97 (3d Cir. 1986) (finding

state fraudulent conveyance law applicable to a leveraged buyout where the transaction

was part of an intentional attempt to use the debtor's assets for the benefit of its

shareholders and at the expense of creditors). Park National is not a creditor of this

Debtor.

The evidence as to the remaining "creditors" is that they either do not hold claims

against this Debtor or do not need the protection of a bankruptcy proceeding. One of the

creditors is a lawyer who represented Singer in connection with his acquisition of the

property; the $68,400 allegedly owed to this lawyer is Singer's debt. The other three

creditors (for a total of $134,928) provided goods or services in response to an order from

an employee of Singer's operation. Singer seeks to allocate the charges to this Debtor,

but it is clear from the record that the charges were provided on the basis of Singer's

credit (or that of his entire operation) and that the creditors expected to and can look to

Singer for payment. To the extent it would be fair to afford Singer a claim against the

estate for some of his expenditures that directly benefited the secured creditor, the Court

can grant Singer a § 506(c) claim, as further discussed below.

The Debtor not only manufactured Park National as an unsecured creditor in the

case but also paid Park National interest on the debt and filed false operating reports that

failed to disclose these payments. As discussed above, it was revealed in connection with

the hearings in the case not only that the Debtor had improperly paid Park National

interest on a claim that was *at best* unsecured, but that the Debtor's operating reports

generally failed to disclose these payments. Singer's excuses were unconvincing, and

although the Debtor has corrected some of its operating reports, it has done nothing about

recovering these unauthorized payments.

As the Court stated in *C-TC 9th Ave. Partnership*, a determination of bad faith

"requires a full examination of all the circumstances of the case…a highly factual

determination… that may sweep broadly." 113 F.3d at 1312. The Debtor's long string of

defaults and invalid or unlawful actions justifies in this case a finding of bad faith. It also

justifies granting the City relief from the automatic stay for "cause." Immediate

dismissal of the case, however, is not justified because of one countervailing factor. As

Singer argues, he made substantial repairs to the Premises during the course of the

bankruptcy, these repairs were made at the City's insistence and were subject to the

City's oversight, and they appear to have provided a long-term and substantial benefit to

the Premises as well as to the City as secured creditor.

Section 506(c) of the Bankruptcy Code provides: "The trustee may recover from

property securing an allowed secured claim the reasonable, necessary costs and expenses

of preserving, or disposing of, such property to the extent of any benefit to the holder of

such claim." Although there is no substantial support in the record for Singer's claim at

trial that he spent $500,000 on repairs (the amounts in the operating reports are much

less), certain of the improvements that Singer made to the property were substantial,

capital improvements that benefited the Premises and the City as the holder of a secured

claim. For these improvements the Debtor appears entitled to protection under § 506(c).

See *In re Bennett Funding Group, Inc*., 1997 Bankr. LEXIS 2359, at *87-88 (Bankr.

N.D.N.Y. Dec. 18, 1997).

**Conclusion**

For the reasons set forth above, the City's motion to lift the stay is granted.  The

Debtor may move for an order providing a charge under § 506(c) for the value of the

repairs that directly benefited the City as a secured creditor, and the parties may take

limited discovery and, if necessary, schedule a hearing on that issue.  The City is directed

to settle an appropriate order on five days' notice.

Dated:  New York, New York
          September 26, 2005

                    _____/s/ Allan L. Gropper_____
                    UNITED STATES BANKRUPTCY JUDGE